**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.**

**DEVON KLEINHEKSEL, HARRY BASS and ERIKA MCDANIEL,** *on behalf of themselves and all others similarly situated,*

Plaintiffs,

v.

**MANAGED CARE OF NORTH AMERICA, INC. d/b/a MCNA DENTAL, MCNA INSURANCE COMPANY d/b/a MCNA DENTAL, and HEALTHPLEX, INC.**,

Defendants.

## CLASS ACTION COMPLAINT

Plaintiffs, Devon Kleinheksel, Harry Bass, and Erika McDaniel ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Consolidated Class Action Complaint action against Managed Care of North America, Inc. d/b/a MCNA Dental ("MCNA, Inc."), MCNA Insurance Company d/b/a MCNA Dental ("MCNAIC") (collectively, "MCNA") and Healthplex, Inc. ("Healthplex") (all collectively, "Defendants"). The following allegations are based upon Plaintiffs' personal knowledge as to their own actions and their counsels' investigations, facts of public record, and upon information and belief as to all other matters.

1. This action arises from Defendants' failure to secure the highly sensitive personal identifiable information ("PII") and protected health information ("PHI") (collectively "Private Information") of Plaintiffs and the members of the proposed Class (defined *infra* ¶ 130) for whom Defendants performed services.

2. MCNA is one of the largest government-sponsored dental insurance providers in

the United States, serving millions of children and adults through Medicaid, Children's Health Insurance Program ("CHIP"), and Medicare.[1] Therefore, MCNA's customer base is comprised of some of the most financially sensitive individuals, who are either on a fixed income as retirees or lack a financial safety net to afford the impacts of MCNA's failure to secure their sensitive personal information. Healthplex is a wholly-owned subsidiary of MCNA, Inc. or one of its affiliated entities, and provides insurance in New York. In these roles, for years, Defendants directly and indirectly collected Private Information from millions of customers. Despite having duties created by statute and common law to safeguard that Private Information entrusted to it, Defendants allowed information concerning millions of people to be stolen and posted on the Internet by a notorious cybercriminal organization.

3. On or about February 26, 2023, hackers first gained access to Defendants' network and stole data containing patients' full name, address, date of birth, telephone number, email address, Social Security number, driver's license number, government-issued ID number, health insurance information (including plan information, insurance company, and member number), Medicaid-Medicare ID number, information about medical care or treatment (visits, dentist name, doctor name, past care, x-rays/photos, medicines, and treatment), and bills and insurance claims (the "Data Breach").[2]

4. Defendants' investigation concluded that the Private Information compromised in the Data Breach included the information of Plaintiffs and approximately 8,923,662 other

---

[1] *Company Overview*, MCNA, https://www.mcna.net/#overview (last visited May 25, 2025).
[2] Bill Toulas, *MCNA Dental data breach impacts 8.9 million people after ransomware attack*, May 29, 2023, https://www.bleepingcomputer.com/news/security/mcna-dental-data-breach-impacts-89-million-people-after-ransomware-attack/ (last visited May 25, 2025).

individuals, including patients, parents, guardians, or guarantors (collectively, "Customers").[3]

5. On March 7, 2023, the LockBit ransomware operation claimed responsibility for the Data Breach.[4] LockBit demanded $10 million or threatened to publish 700 GB of sensitive, confidential information they allegedly exfiltrated from Defendants' computer networks.[5] On information and belief, ransomware demands are often resolved for a small fraction of the initial demand amount. For example, a $10 million demand like the one here could resolve for only hundreds of thousands of dollars. Nevertheless, on information and belief, Defendants did not pay any amount to resolve the ransomware demand. Consequently, on April 7, 2023, LockBit made the stolen data available for download by anyone through its own public-facing website (a "dump site").[6]

6. As a result of Defendants' impermissibly lax data security practices, Plaintiffs and putative class members ("Class Members," defined herein) are at a present and continuing risk for identity and medical identity theft. Defendants compounded this harm by waiting more than two months before notifying affected Customers that their highly sensitive Private Information was now in the hands of sophisticated cybercriminals.

7. It was not until May 26, 2023—eleven weeks after Defendants detected the attack on March 6, 2023—that Defendants began notifying Customers of the Data Breach. Defendants' inexcusable delays permitted the cybercriminals greater access to its servers and prevented Customers from taking immediate defensive measures to protect their valuable Private

---

[3] *Id.* (citing Office of the Maine Atty. Gen., *Data Breach Notifications*, available at https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/895b95c8-abc8-41f1-8c3f-b0415575de56.shtml (last visited May 25, 2025)).
[4] *Id.*
[5] *Id.*
[6] *Id.*

Information. *See* Exemplar Notice Letter, attached hereto as ***Exhibit A***; Bass Notice Letter from MCNA and Healthplex, attached hereto as ***Exhibit B*.**

8. The Data Breach was a direct result of Defendants' deficient cybersecurity practices, and the wealth of information and warnings available to Defendants make its failures even more egregious.

9. Taking reasonable, standard precautions against cybercrime and data breaches is a fundamental duty of doing business in the modern age—especially for businesses that profit from analyzing and processing Private Information. By collecting, maintaining, and profiting from Plaintiffs' and Class Members' Private Information, Defendants were required by law to exercise reasonable care and comply with industry and statutory requirements to protect that information—and it failed to do so.

10. Among myriad industry standards and statutes for protection of sensitive information, health care information is specifically governed by federal law under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations. HIPAA requires entities like Defendants to take appropriate technical, physical, and administrative safeguards to secure the privacy of PHI, establishes national standards to protect PHI, and requires timely notice of a breach of unencrypted PHI.

11. Instead, Defendants disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to implement reasonable measures to safeguard its Customers' Private Information and by failing to take necessary steps to prevent unauthorized disclosure of that information. Defendants' woefully inadequate data security measures made the Data Breach a foreseeable, and even likely, consequence of its negligence.

12. Defendants admit that Social Security numbers, driver's licenses, and other

government ID data was taken in the Data Breach. These types of PII are especially valuable on the dark web and especially likely to be aggregated into dark web databases and subjected to identity theft because they are the documents used to provide proof of identity for all manners of purchase and lease agreements. The trade in forged government identity documents on the dark web is vast, and it is the primary method by which identity thieves obtain both the data and the forged documents that are utilized in identity theft crimes.

13. Further, by aggregating this information obtained from the Data Breach with other sources, or other methods, criminals can assemble a full dossier of Private Information on an individual in order to facilitate a wide variety of frauds, thefts, and scams. Criminals can and do use victims' names, birth dates, Social Security numbers, and addresses to open new financial accounts, incur charges on credit, obtain government benefits and identifications, fabricate identities, and file fraudulent tax returns well before the person whose PII was stolen becomes aware of it.[7] Any one of these instances of identity theft can have devastating consequences for the victim, causing years of often irreversible damage to their credit scores, financial stability, and personal security.

14. Likewise, the exfiltration of PHI puts Plaintiffs and Class Members at a present and continuing risk for medical identity theft, especially in light of the high demand and value of

---

[7] *See, e.g.*, *Report to Congressional Requesters*, U.S. GOV'T ACCOUNTABILITY OFFICE (June 2007), http://www.gao.gov/assets/270/262899.pdf; Melanie Lockert, *How do hackers use your information for identity theft?*, CREDITKARMA (Oct. 1, 2021), https://www.creditkarma.com/id-theft/i/how-hackers-use-your-information; Ravi Sen, *Here's how much your Private Information is worth to cybercriminals—and what they do with it*, PBS (May 14, 2020), https://www.pbs.org/newshour/science/heres-how-much-your-personal-information-is-worth-to-cybercriminals-and-what-they-do-with-it; Alison Grace Johansen, *4 Lasting Effects of Identity Theft*, LIFELOCK BY NORTON (Feb. 4, 2021), https://lifelock.norton.com/learn/identity-theft-resources/lasting-effects-of-identity-theft.

Medicare identification numbers on the dark web.[8] Medical identity theft poses an even more critical threat to victims—medical fraud could lead to loss of access to necessary healthcare through misuse of paid-for insurance benefits or by incurring substantial medical debt.

15. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[9]

16. Due to the highly valuable nature of PHI, the FBI has warned healthcare providers that they are likely to be the targets of cyberattacks like the attack that caused the Data Breach.[10]

17. Adding insult to injury, there has been no assurance offered by Defendants that all personal data or copies of data have been recovered or destroyed, or that Defendants have adequately enhanced its security practices or dedicated sufficient resources and staff to avoid a similar breach of its network in the future.

18. Furthermore, the known modus operandi of the LockBit ransomware group puts Plaintiffs and Class Members at a much higher likelihood of ongoing risk. LockBit is well known to perform retaliatory "data dumps" of stolen information when corporate victims of its data breach activities refuse to pay their extortion demands. Indeed, they operate a notorious data breach "dump site" on the dark web where they make Plaintiffs' and Class Members' data available to anyone who cares to take it as a method of both punishing those who do not pay and as a means to

---

[8] *What to Know About Medical Identity Theft*, FED. TRADE COMM'N (Sept. 2024), https://consumer.ftc.gov/articles/what-know-about-medical-identity-theft.

[9] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/.

[10] Jim Finkle, *FBI warns healthcare firms they are targeted by hackers*, REUTERS (Aug. 20, 2014), https://www.reuters.com/article/technology/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U/.

validate their threats to future victims.

19. As a direct and proximate result of the Data Breach, Plaintiffs and Class Members have suffered actual and present injuries, including but not limited to: (a) present and continuing threats of identity theft crimes, fraud, scams, and other misuses of their Private Information; (b) diminution of value of their Private Information; (c) loss of benefit of the bargain (price premium damages); (d) loss of value of privacy and confidentiality of the stolen Private Information; (e) illegal sales of the compromised Private Information; (f) mitigation expenses and time spent on credit monitoring; (g) identity theft insurance costs; (h) "out of pocket" costs incurred due to actual identity theft; (i) credit freezes/unfreezes; (j) expense and time spent on initiating fraud alerts and contacting third parties; (k) decreased credit scores; (l) lost work time; (m) anxiety, annoyance, and nuisance; and (n) continued risk to their Private Information, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

20. Plaintiffs and Class Members would not have provided their valuable PII and sensitive PHI to Defendants had they known that Defendants would make the Private Information Internet-accessible, not encrypt personal and sensitive data elements such as Social Security numbers, Medicare numbers, health insurance identification numbers, driver's licenses and other government IDs, and dates of birth, and not delete the Private Information it no longer had reason to maintain.

21. Through this lawsuit, Plaintiffs seek to hold Defendants responsible for the injuries it inflicted on Plaintiffs and approximately 8.9 million similarly situated people due to its impermissibly inadequate data security measures, and to seek injunctive relief to ensure the implementation of security measures to protect the Private Information that remains in the

possession of Defendants.

## JURISDICTION AND VENUE

22. This Court has original subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because the amount in controversy for the Class exceeds the sum of $5,000,000, exclusive of interest and costs, there are more than 100 Class Members, and minimal diversity exists because many Class Members are citizens of a different state than Defendants.

23. This Court has general personal jurisdiction over MCNA, Inc. and MCNAIC because their headquarters and principal places of business are in Fort Lauderdale, Florida. This Court has specific personal jurisdiction over Healthplex as to Plaintiff Bass and the putative New York Subclass, because Healthplex purposely availed itself of Florida's jurisdiction where Healthplex's customers' Private Information was stored and managed on the systems of MCNA, Inc. and/or MCNAIC.

24. Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), (b)(2), and (c)(2) because a substantial part of the events giving rise to the claims emanated from activities within this District, and MCNA conducts substantial business in this District. In addition, on information and belief, Plaintiffs' and Class Members' Private Information was maintained within this District.

## PARTIES

### Plaintiff, Devon Kleinheksel

25. Plaintiff, Devon Kleinheksel ("Plaintiff D. Kleinheksel"), is, and at all relevant times has been, a resident and citizen of Iowa.

26. Plaintiff D. Kleinheksel received benefits from MCNA by virtue of his health plan membership.

27. Plaintiff D. Kleinheksel received a Notice Letter from "MCNA Dental" dated May 26, 2023, concerning the Data Breach.

28. Plaintiff D. Kleinheksel was a victim of identity theft following the Data Breach. After the Data Breach, he had about 10 to 15 unauthorized charges on his bank account, requiring that his debit card be cancelled and to open a new bank account with another financial institution. Due to the breach, Plaintiff D. Kleinheksel had to reset automatic billing instructions tied to the compromised account. Since the Data Breach, Plaintiff D. Kleinheksel has noticed a marked increase in spam texts asking him to respond. He is fearful that he will experience identity theft in the future, causing him to lose money and/or take on increased debt, which could negatively affect his credit score. He has been experiencing anxiety and stress as a result of the Data Breach and is concerned about how the Data Breach will affect his credit.

29. As a direct and proximate result of the Data Breach, Plaintiff D. Kleinheksel has made reasonable efforts to mitigate the impact of the Data Breach, including by regularly and closely monitoring his financial accounts.

30. As a result of the Data Breach, Plaintiff D. Kleinheksel anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. He has faced and faces a present and continuing risk of fraud and identity theft for his lifetime.

**Plaintiff, Harry Bass**

31. Plaintiff, Harry Bass, is, and at all relevant times has been, a resident and citizen of New York.

32. Plaintiff Bass received benefits from Healthplex by virtue of his health plan membership.

33. Plaintiff Bass received a Notice Letter from "MCNA Dental" and Healthplex dated May 26, 2023, concerning the Data Breach. *See* Ex. B.

34. Since the Data Breach, Plaintiff Bass has experienced an increased number of phishing calls and spam text messages. He is fearful that he will experience identity theft in the future, causing him to lose money and/or take on increased debt, which could negatively affect his credit score. He has experienced increased anxiety as a result of the Data Breach and is anxious and fearful that he will be the victim of identity theft or other fraud in the future because his information was exposed in the Data Breach.

35. As a direct and proximate result of the Data Breach, Plaintiff Bass has made reasonable efforts to mitigate the impact of the Data Breach. He has spent hours monitoring his financial accounts, obtaining credit reports, and signing up for a paid credit monitoring service. Further, he spent time and effort reporting the suspicious calls to the Federal Communications Commissions and placed himself on the do not call list.

36. As a result of the Data Breach, Plaintiff Bass anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harm caused by the Data Breach. He has faced and faces a present and continuing risk of fraud and identity theft for his lifetime.

**Plaintiff, Erika McDaniel**

37. Plaintiff, Erika McDaniel, is, and at all relevant times has been, a resident and citizen of Louisiana.

38. Plaintiff McDaniel received benefits benefits from MCNA by virtue of her health plan membership.

39. Plaintiff McDaniel received a Notice Letter from "MCNA Dental" dated May 26, 2023, concerning the Data Breach.

40. Plaintiff McDaniel was a victim of identity theft following the Data Breach. After the Data Breach, she experienced numerous unauthorized charges on her credit card, which she disputed, and ultimately because the charges continued, she opened a new credit card account. Plaintiff McDaniel has experienced a significant increase in phishing calls and spam text messages since the Data Breach. She is fearful that she will experience identity theft in the future, causing her to lose money and/or take on increased debt, which could negatively affect her credit score. As a result of the Data Breach, she has been experiencing anxiety and stress and is concerned about how the Data Breach will affect her credit.

41. As a direct and proximate result of the Data Breach, Plaintiff McDaniel has made reasonable efforts to mitigate the impact of the Data Breach, including by regularly and closely monitoring her financial accounts.

42. Plaintiff McDaniel has faced and faces a present and continuing risk of fraud and identity theft for her lifetime.

**Defendants**

43. MCNA, Inc. is incorporated and validly existing under the laws of Florida, with its headquarters and principal place of business located at 200 West Cypress Creek Road, Suite 500, Fort Lauderdale, Florida 33309.

44. MCNAIC is incorporated and validly existing under the laws of Texas with its headquarters and principal place of business located at 200 West Cypress Creek Road, Suite 500, Fort Lauderdale, Florida 33309.

45. Healthplex is incorporated and validly existing under the laws of Delaware, with its headquarters and principal place of business located at 333 Earle Ovington Blvd., Suite 300, Uniondale, New York 11553. Healthplex is a wholly owned subsidiary of MCNA, Inc. or one of

its affiliated entities.

## FACTUAL ALLEGATIONS

### A. Defendants Collect and Use Personal and Sensitive Customer Data.

46. MCNA "is a leading dental benefits manager committed to providing high quality services to state agencies and managed care organizations for their Medicaid, [CHIP], and Medicare members."[11] MCNA's website defines MCNA Dental as both "MCNA Insurance Company and Managed Care of North America, Inc."[12] MCNA's website states that "MCNA Dental is the largest dental insurer in the nation for government-sponsored Medicaid and CHIP programs" and has millions of customers across multiple states.[13]

47. Specifically, MCNA, Inc. operates as a dental insurer in Florida (through Florida Health Kids Corporation for CHIP insureds, and through the Florida Agency for Health Care Administration for Medicaid insureds), and outside Florida, it operates as a third-party administrator providing operational services such as claims processing.

48. MCNAIC operates or operated as a dental insurer in Arkansas, Idaho, Iowa, Louisiana, Nebraska, Texas, and Utah.

49. Healthplex operates as a dental insurer in the state of New York, including for government-sponsored plans. In 2019, Healthplex was acquired by MCNA, Inc. or one of its affiliated entities.[14]

50. Defendants collect and processes an enormous volume of personal data from

---

[11] Company Overview, *supra* n.1.
[12] *Id.*
[13] *Home*, MCNA, https://www.mcna.net/ (last visited May 25, 2025).
[14] *See, e.g.*, MCNA, *Healthplex Acquired by Affiliates of MCNA* Dental (Sept. 17, 2019), https://www.prnewswire.com/news-releases/healthplex-acquired-by-affiliates-of-mcna-dental-300920114.html.

millions of Customers, including Private Information like health and patient records, insurance information, and financial information. Some of this information is not provided to Defendants directly, but through Medicaid, CHIP, or Medicare. This personal data is collectively managed and maintained on MCNA computer systems for both MCNA entities and Healthplex whose data was part of the Data Breach.

51. MCNA's website contains a Notice of Privacy Practices, in which it states, "One of our strengths is our ability to administer dental plans in an effective and innovative manner while safeguarding our members' protected health information. . . . "[15] MCNA also claims it is "committed to complying with the requirements and standards of the Health Insurance Portability and Accountability Act of 1996 (HIPAA)."[16] The Notice of Privacy Practices explicitly states it "applies to all MCNA dental programs that are administered by Managed Care of North America, Inc. and MCNA Insurance Company."[17]

52. MCNA states it must follow the privacy practices in its Notice of Privacy Practices, which applied to both MCNA, Inc. and MCNAIC.[18]

53. MCNA claims to protect PHI, including medical information and other PII like names, addresses, telephone numbers, and Social Security numbers, "in all formats including electronic, written and oral information."[19]

54. MCNA acknowledges that "[t]he law says MCNA has to keep your health information private."[20] It further acknowledges that "[i]n keeping with federal and state laws and

[15] *Privacy Practices*, MCNA, https://www.mcna.net/en/privacy (last visited May 25, 2025).
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] Privacy Practices, *supra* n.15.

our own policy, we have a responsibility to protect the privacy of your information" and that it is "required by law to maintain the privacy and security of your protected health information."[21]

55. MCNA claims it "will not use or share your information other than as described [in the Notice of Privacy Practices] unless you tell us we can in writing."[22] The Notice of Privacy Practices lists several ways that MCNA may use its Customers' information, including, *inter alia*, for research, to comply with the law, and to address workers' compensation claims.[23]

56. MCNA promises to "let you know promptly if a breach occurs that may have compromised the privacy or security of your information."[24] Notably, the Privacy Policy does not disclose that third parties, who may be reckless and/or negligent, will collect, process, and store PHI protected under HIPAA.

57. MCNA's website previously touted its proprietary management information system, DentalTrac™, which it uses to manage "enrollment, provider network, claims handling, and other operations data," as "ensur[ing] the security and availability of data through strict adherence to HIPAA requirements, keeping MCNA Dental in full compliance with all federal regulations." MCNA's website also stated that "DentalTrac™ is hosted across multiple geographically dispersed, military grade, secure, and state-of-the-art data centers" and that the system "has been based on HIPAA-compliant solutions. MCNA is fully committed to ensuring a clear and easy path to HIPAA readiness well ahead of federally mandated compliance deadlines."[25]

58. Healthplex's Notice of Privacy Practices states: "We are required by law to

---

[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Our Technology*, MCNA, https://www.mcna.net/en/technology/ (last visited Nov. 11, 2023).

maintain the privacy and security of your protected health information."[26] Moreover, Healthplex's Financial Information Privacy Notice states it "is committed to maintaining the confidentiality of your personal financial information," defined to include "information about an enrollee or an applicant for health care coverage that identifies the individual, is not generally publicly available, and is collected from the individual or is obtained in connection with providing health care coverage to the individual."[27]

59. Plaintiffs and Class Members relied on Defendants' promises to keep their Private Information confidential and securely maintained, and to only make authorized disclosures of this information. Defendants failed to do so.

## B. **<u>Defendants Allowed the Private Information of Plaintiffs and Class Members to Be Compromised in the Data Breach.</u>**

60. According to the Notice of Data Breach posted on MCNA's website, Defendants "became aware that an unauthorized party was able to access certain MCNA systems" on March 6, 2023, and "subsequently discovered that certain systems within the network may have been infected with malicious code. Through its investigation, MCNA determined that an unauthorized third party was able to access certain systems and remove copies of some personal information between February 26, 2023 and March 7, 2023."[28]

61. In other words, Defendants' investigation revealed that its cyber and data security

---

[26] Notice of Privacy Practices, HEALTHPLEX, available at https://yourdentalportal.com/sbd-content/content/dam/sbdportal/apps/sbd-ui/healthplex/plan-documents/f-2507-data-privacy-notice_2025.pdf (last visited May 25. 2025).
[27] Financial Information Privacy Notice, HEALTHPLEX, available https://yourdentalportal.com/sbd-content/content/dam/sbdportal/apps/sbd-ui/healthplex/plan-documents/f-2507-data-privacy-notice_2025.pdf (last visited May 25. 2025).
[28] *Notice Letter*, MCNA (May 26, 2023), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/895b95c8-abc8-41f1-8c3f-b0415575de56.shtml (last visited May 25, 2025) (under "Notification and Protection Services" heading, click link titled "MCNA - ME Individual Notice Letters.pdf").

systems were completely inadequate and allowed cybercriminals to obtain files containing a treasure trove of millions of its Customers' highly sensitive Private Information.

62. At all relevant times, Defendants were aware, or reasonably should have been aware, that the Private Information they collected, maintained, and stored in their servers is highly sensitive, susceptible to attack, and could be used for malicious purposes by third parties, such as identity theft, medical identity theft, fraud, and other misuse.

63. The frequency and prevalence of attacks make it imperative for entities to monitor for exploits and attacks routinely and constantly, and regularly update their software and security procedures.

64. Defendants were fully aware the healthcare benefits industry is a prime target for cyber threats.[29] High profile data breaches of similar industry leaders in healthcare put them on notice of this fact, *e.g.*, Trinity Health (3.3 million patients, May 2020); Shields Healthcare Group (2 million patients, March 2022). Between 2020 and 2021, attacks on the healthcare industry increased 71%, making it the fifth most common industry targeted by cyberattacks.[30]

65. The notorious LockBit ransomware gang claimed responsibility for the cyberattack.[31] LockBit is one of the most active ransomware actors, having breached over 1,000 companies worldwide.[32] LockBit is a Russian criminal organization and operates openly.

---

[29] *See* Finkle, *supra* n.10.

[30] Check Point Research Team, *Check Point Research: Cyber Attacks Increased 50% Year over Year*, CHECK POINT (Jan. 10, 2022), https://blog.checkpoint.com/security/check-point-research-cyber-attacks-increased-50-year-over-year.

[31] Carly Page, *Ransomware attack on US dental insurance giant exposes data of 9 million patients*, TECHCRUNCH (May 31, 2023), https://techcrunch.com/2023/05/31/ransomware-attack-on-us-dental-insurance-giant-exposes-data-of-9-million-patients/?guccounter=1.

[32] Jeff Stone & Ryan Gallagher, *LockBit Hackers Behind ION Breach Also Hit Royal Mail, Hospital*, BLOOMBERG (Feb. 2, 2023), https://www.bloomberg.com/news/articles/2023-02-02/lockbit-hackers-behind-ion-breach-also-hit-royal-mail-hospital.

CISA.gov reports that in 2022, LockBit was responsible for 18% of all ransomware attacks in the United States and similar percentages internationally.[33] They have compromised more than 1700 corporations and have dumped the data of all companies that are known to have not paid their ransomware demands onto the dark web for any takers. LockBit's dump site currently contains links to download the data of hundreds of breached companies.

66. Defendants knew or should have known of the tactics that groups like LockBit employ, and how to guard against them. For one thing, MCNA is a member of Healthcare Information and Management Systems Society (HIMSS), a nonprofit that advises on the best use of information technology and management systems.[34]

67. Moreover, Defendants knew or should have known of ransomware targeting their systems available on the dark web. MCNA is a member of the Health-Information Sharing and Analysis Center ("Health-ISAC"), a nonprofit that proactively alerts its members of cybersecurity threats,[35] All Health-ISAC subscribers receive for free Level 1 and Level 2 alerts, and members like MCNA receive Level 3 alerts, including from the FBI. Therefore, the cost to Defendants of taking the precaution of monitoring relevant cybersecurity alerts would have been negligible.

68. Prior to the Data Breach, Defendants had many chances to increase their cybersecurity measures. For example, since as early as 2019, Genesis Market, dark web marketplace for popular and considered highly reputable among cybercriminals, advertised credentials for mcna.net. For illustration, this is a screenshot of the well-known Genesis Market:

---

[33] https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-165a (last visited May 25, 2025).
[34] https://www.himss.org/ (last visited May 25, 2025).
[35] https://h-isac.org/ (last visited May 25, 2025).




Then, since as early as August 28, 2021, The Russianmarket, another dark web marketplace, was advertising ransomware tools to access the MCNA patient portal. In addition, between September 3, 2021, and October 25, 2022, 2Easy, a dark web marketplace known for selling ransomware tools to access vulnerable websites,[36] was advertising the sale of ransomware to access the MCNA patient portal on the dark web, and offered a full refund if the product did not work.

69. These vulnerabilities may have directly contributed to the Data Breach. At the very least, these vulnerabilities should have been warning signs to Defendants to increase their general data security.

70. With the Private Information secured and stolen by LockBit, the hackers then purportedly issued a ransom demand to Defendants of $10 million. On information and belief, Defendants refused to negotiate with the hackers or pay the ransom. On April 7, 2023, the presumed deadline of LockBit's ransom demand, LockBit posted over 700 GB of files exfiltrated

[36] Bill Toulas, *2easy now a significant dark web marketplace for stolen data*, BLEEPING COMPUTER (Dec. 21, 2021), https://www.bleepingcomputer.com/news/security/2easy-now-a-significant-dark-web-marketplace-for-stolen-data/ (May 25, 2025).

from the Data Breach on its dump site:




71. Data dumped on LockBit's dump site is downloaded by data aggregators aggregated into datasets, and sold on the dark web to various illegal operators, such as identity thieves, payment card duplicators, private information data brokers, and other operators. On information and belief, Plaintiffs' and Class Members' data was posted by LockBit on the dump

site and has been exposed for theft and sale on the dark web. This information will remain on the site indefinitely, causing ongoing risk and continuing harms to plaintiffs.

72. LockBit's history[37] makes the disclosure of Plaintiffs' and Class Members' Private Information to illegal operators a near certainty.[38]

73. Further, the proof data openly published by LockBit proves it has taken far more information from Defendants than they admits in the Notice Letters. LockBit claims (with evidence) that it exfiltrated over 700 GB of data from Defendants, which appears to be most—if not all—of the document data Defendants hold. The proof exhibited by LockBit includes documents regarding employees and Plaintiffs, as well as Defendants' business contracts, tax documents, and all other types of documents a corporation might store. Given the breadth and volume of data taken, it is very likely that (a) Defendants do not know the extent of information taken and (b) the theft includes *all* information Defendants hold regarding Plaintiffs.

**C. Defendants Failed to Comply with Regulatory Requirements and Industry Practices.**

74. Federal and state regulators have established security standards and issued recommendations to temper data breaches and the resulting harm to consumers and the healthcare sector. There are a number of state and federal laws, requirements, and industry standards governing the protection of Private Information.

75. For example, at least 24 states have enacted laws addressing data security practices

[37] James Pearson, *Boeing data published by Lockbit hacking gang*, REUTERS (Nov. 10, 2023), https://www.reuters.com/technology/cybersecurity/boeing-data-published-by-lockbit-hacking-gang-2023-11-10/ (last visited May 25, 2025).

[38] "BITWISE SPIDER's LockBit RaaS [Ransomware-as-a-Service] remained the most prolific BGH [Big Game Hunting] operation in 2022 — the adversary's affiliates posted more than 800 victim organizations to the LockBit DLS [Download Site] in 2022." Crowdstrike, *2023 Global Threat Report*, available at https://go.crowdstrike.com/2023-global-threat-report-thank-you.html (last visited May 25, 2025).

that require businesses that own, license, or maintain Private Information about a resident of that state to implement and maintain "reasonable security procedures and practices" and to protect Private Information from unauthorized access. Florida is one such state and requires that entities like Defendants "take reasonable measures to protect and secure data in electronic form containing personal information." Fla. Stat. § 501.171(2).

76. Additionally, cybersecurity firms have promulgated a series of best practices that at a minimum should be implemented by sector participants including, but not limited to: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting of physical security systems; protecting against any possible communication system; and training staff regarding critical points.[39]

77. The Federal Trade Commission ("FTC") has issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making.[40]

78. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[41] The guidelines note businesses should protect the personal customer information that they keep; properly dispose of Private Information that is no longer needed;

---

[39] *See Addressing BPO Information Security: A Three-Front Approach*, DATAMARK, INC. (Nov. 2016), https://insights.datamark.net/addressing-bpo-information-security.

[40] *Start With Security: A Guide for Business*, FED. TRADE COMM'N, at 2, https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf (last visited May 25, 2025).

[41] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N, https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited May 25, 2025).

encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

79. The FTC also recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[42]

80. The FTC has brought enforcement actions against businesses for failing to protect customer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

81. The FTC has interpreted Section 5 of the FTC Act to encompass failures to appropriately store and maintain personal data. The body of law created by the FTC recognizes that failure to restrict access to information[43] and failure to segregate access to information[44] may

[42] *See id.*
[43] *In the Matter of LabMD, Inc.*, Dkt. No. 9357, at 15 ("Procedures should be in place that restrict users' access to only that information for which they have a legitimate need."), https://www.ftc.gov/ system/files/documents/cases/160729labmd-opinion.pdf.
[44] *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 258 (3d Cir. 2015) (stating that companies should use "readily available security measures to limit access between" data storage systems).

violate the FTC Act.

82. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data (*i.e.*, Private Information), in all the specific ways alleged *infra* ¶ 92, constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

83. Furthermore, Defendants are required to comply with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C. The Privacy Rule and the Security Rule set nationwide standards for protecting health information, including health information stored electronically.

84. The Security Rule requires Defendants to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.[45]

85. Pursuant to HIPAA's mandate that Defendants follow "applicable standards,

---

[45] *Summary of the HIPAA Security Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/security/laws-regulations/index.html (last visited May 25, 2025).

implementation specifications, and requirements . . . with respect to electronic protected health information," 45 C.F.R. § 164.302, Defendants were required to, at minimum, "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(e), and "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

86. Defendants are also required to follow the regulations for safeguarding electronic medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

87. Both HIPAA and HITECH obligate Defendants to follow reasonable security standards, respond to, contain, and mitigate security violations, and to protect against disclosure of sensitive patient Private Information. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); 45 C.F.R. § 164.530(f); 42 U.S.C. § 17902.

88. In all the ways enumerated in Paragraph 138 above, Defendants failed to comply with HIPAA, HITECH, the FTC Act, and Fla. Stat. § 501.171(2). They failed to maintain adequate security practices, systems, and protocols to prevent data loss, failed to mitigate the risks of a data breach and loss of data, and failed to ensure the confidentiality and protection of Private Information.

**D. Defendants Breached Their Duties to Plaintiffs and Class Members.**

89. As entities collecting, maintaining, and profiting from Plaintiffs' and Class Members' highly sensitive Personal Information, Defendants had a duty to exercise reasonable care and comply with applicable industry standards and statutory security requirements to protect

their information.

90. Furthermore, because Defendants collected and maintained Plaintiffs' and Class Members' Personal Information, and because Defendants were aware their participation in the healthcare industry rendered them—and, by extension, the customers whose data Defendants' aggregated and maintained—prime targets of cyber threats, Defendants were under a duty either to lessen the risk that Plaintiffs' and Class Members' Personal Information would be subject to a cyberattack, or to see that sufficient precautions were taken to protect Plaintiffs' and Class Members' Personal Information from the harm that the risk of a cyberattack posed.

91. As enumerated below, Defendants breached this duty of care to protect sensitive patient Private Information from reasonably foreseeable cyberattacks, including the Data Breach, and to see that sufficient precautions were taken to protect against the harm to Plaintiffs and Class Members that cyber threats posed to aggregated and collected Personal Information in Defendants' possession.

92. Defendants' specific negligent cybersecurity failures included, *inter alia*:

a. Failing to encrypt all sensitive patient Private Information;

b. Failing to implement hardened firewall rules, to blacklist traffic from and to IP addresses known to be malicious;

c. Failing to implement geo-blocking rules to sufficiently restrict access points into Defendants' server environment, so that, if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

d. Failing to enhance password complexity requirements and change administrative-level system accounts' passwords;

e. Failing to install patches to known vulnerabilities in their Citrix cloud

software;

f. Failing to respond appropriately to warning, including from the FBI, that ransomware targeting Defendants' patient portal was available for sale on the dark web which they would have received as member of Health-ISAC;

g. Failing to detect and screen for threats in ingress and egress network traffic from international servers despite that Defendants' insureds entirely reside within the United States and would not ordinarily check dental insurance records or make a dental appointment from outside the United States, and despite the international nature of the organizations and threats faced;

h. Failing to include fail-safe features in their systems that, upon detecting unusual levels of international traffic, would have locked down and insulated their systems—and Plaintiffs' and Class Members' Personal Information—from cyber thefts such as the Data Breach;

i. Naming their domains and subdomains in ways that suggested they would likely contain patient Private Information, rather than storing all sensitive patient Private Information in subdomains with innocuous names;

j. Exposing third-party partner services (including Blackbaud, Inc., whose systems were previously compromised in a well-known data breach disclosed years before Defendants' Data Breach, in 2020) in its subdomains and links that may allow threat actors access by impersonating or compromising attached services and domains;

k. Failing to install sufficient system and security monitoring software across all their servers;

l. Failing to conduct database scanning and securing checks with sufficient

frequency;

m. Failing to implement multi-factor authentication across computer systems,, especially where multi-factor authentication is an inexpensive, industry standard, and efficient tool widely available to Defendants to safeguard Plaintiffs' and Class Members' Private Information from cyberthreats, including the Data Breach;

n. Failing to require employees and contractors to change their passwords, and provide account holders with prompts to change their passwords, with sufficient frequency;

o. Failing to require employees to use passwords of sufficient complexity;

p. Failing to provide refresher HIPAA training to its active workforce with sufficient frequency;

q. Failing to issue laptops with sufficiently heightened security standards to all MCNA employees;

r. Failing to implement a threat management program to appropriate monitor Defendants' networks for external threats, and to assess, with sufficient frequency, whether monitoring tools are properly configured, tested, and updated; and

s. Failing to delete and purge the Private Information of Plaintiffs and Class Members no longer needed, such as of former insureds, and/or of medical information (*e.g.*, medicines, treatment information) past the statute-of-limitations for disputing a claim.

93. These failures, alone or in combination, constituted breaches of Defendants' duty of reasonable care to keep patient Private Information safe and secure from known cyberattack threats.

94. Indeed, Defendants were on notice that they were maintaining highly valuable data, which they knew was at risk of being targeted by cybercriminals, and knew of the extensive harm

that would occur if Plaintiffs' and Class Members' Private Information was exposed through a data breach.

95. Because Plaintiffs and Class Members provided their Private Information to Defendants, Defendants had a special relationship with Plaintiffs and Class Members which created an independent duty of care. Defendants had a duty to use reasonable security measures because they undertook to collect, store, and use Customers' Private Information.

96. Despite holding Private Information for almost more than 8.9 million individuals, Defendants failed to adopt reasonable data security measures to prevent and detect unauthorized access to their highly sensitive databases, putting their Customers' highly sensitive information at risk.

97. As such, Defendants failed to properly implement data security practices that were reasonable and up to industry standards.

**E. Defendants' Delay in Securing Their Systems and Notifying Its Customers of the Data Breach Caused Harm to Plaintiffs and Class Members.**

98. Although Defendants' systems were first compromised on or about February 26, 2023, Defendants did not recognize that their servers had been hacked until eight days later, on March 6, 2023.

99. Upon information and belief, Defendants failed to update their systems to include the indicators of compromise or make any mitigation efforts until March 6, 2023, leaving their systems unprotected and open for exploitation for over a week.

100. On May 3, 2023, 58 days after it discovered the theft of its Customers' highly sensitive Private Information, Defendants notified the Office of the Maine Attorney General that

8,923,662 individuals were affected by the Data Breach.[46]

101. Defendants also waited well over two months after they discovered their Customers' Private Information had been stolen before sending Notice Letters to individuals whose data was stolen in the Data Breach. While Defendants first sent Notice Letters to impacted individuals on May 26, 2023, Notice Letters to some Plaintiffs were not sent until June 11, 2023 or even later. MCNA's Notice Letter stated the following:

> **What happened?**
> On March 6, 2023, MCNA became aware of certain activity in our computer system that happened without our permission. We quickly took steps to stop that activity. We began an investigation right away. A special team was hired to help us. We learned a cybercriminal was able to see and take copies of some information in our computer system between February 26, 2023 and March 7, 2023.
>
> **What information may have been involved?**
> On May 4, 2023, we told the state Medicaid agency that this event may have involved your information. Here is the list of information that was seen and taken:
>
> - Information used to contact you, like first and last name, address, date of birth, telephone number, email
> - Social Security number
> - Driver's license number/other government-issued ID number
> - Health insurance (plan information, insurance company, member number, Medicaid-Medicare ID numbers)
> - Care for teeth or braces (visits, dentist name, doctor name, past care, x-rays/photos, medicines, and treatment)
> - Bills and insurance claims
>
> Some of this information was for a parent, guardian, or guarantor. A guarantor is the person who paid the bill. Information which was seen and taken was not the same for everyone.[47]

102. The Notice Letter makes no mention the Data Breach involved a ransomware attack, of the ransom demanded by LockBit, or Defendants' refusal to pay even $1.12 per impacted

---

[46] Office of the Maine Attny. Gen., *Data Breach Notifications: Managed Care of North America, Inc.*, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/895b95c8-abc8-41f1-8c3f-b0415575de56.shtml (last visited May 25, 2025).

[47] Ex. A; *see also* Ex. B (Notice Letter from "MCNA Dental" and Healthplex).

person (or less) to prevent LockBit from publishing Plaintiffs' and Class Members' highly sensitive Private Information.

103. The Notice Letter also omitted the size and scope of the Data Breach, the ransomware used, or what steps Defendants took or intended to take (if any) to enhance their data security systems and monitoring capabilities to prevent further breaches. Without changes to Defendants' own practices, Plaintiffs' and Class Members' sensitive information remains at risk.

104. Defendants' inadequate communications have left Plaintiffs and Class Members in the dark regarding the extent of the harm they have suffered, and Defendants have demonstrated a pattern of providing inadequate notices and disclosures about the Data Breach.

**F. <u>The Data Breach Harmed Plaintiffs and Class Members.</u>**

105. Defendants' failure to keep Plaintiffs' and Class Members' Private Information secure has had severe ramifications, examples of which are alleged above for the Plaintiffs. Given the sensitive nature of the information stolen in the Data Breach—names, Social Security numbers, birthdates, addresses, health information—hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiffs and Class Members now and into the indefinite future.

106. This data is highly coveted and valuable on underground or black markets. Upon information and belief, Plaintiffs' and Class Members' data has already been leaked and sold on the black market.

107. Cybercriminals sell health information at a far higher premium than stand-alone PII. This is because health information enables thieves to go beyond traditional identity theft and obtain medical treatments, purchase prescription drugs, submit false bills to insurance companies,

or even undergo surgery under a false identity.[48] The shelf life for this information is also much longer—while individuals can update their credit card numbers, they are less likely to change their Medicare numbers, health insurance information, or Social Security numbers.

108. Medicare beneficiary numbers like Plaintiffs' are "even more valuable than stolen credit cards," and often result in the filing of false claims for Medicare reimbursement.[49]

109. According to the U.S. Government Accountability Office, "stolen data may be held for up to a year or more before being used to commit identity theft," and "once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years."[50]

110. Because of its value and the loss of sensitive health information and Social Security numbers, future identity theft is imminently and certainly impending.

111. The exposure of any Private Information can cause unexpected harms one would not ordinarily associate with the type of information stolen. Cybercriminals routinely aggregate Private Information from multiple illicit sources and use stolen information to gather even more information through social engineering, credential stuffing, and other methods. The resulting complete dossiers of Private Information are particularly prized among cybercriminals because they expose the target to every manner of identity theft and fraud.

112. Identity thieves can use Private Information such as that exposed in the Data Breach to: (a) apply for credit cards or loans; (b) purchase prescription drugs or other medical services;

---

[48] *Medical Identity Theft: FAQs for Health Care Providers and Health Plans*, FTC, https://www.ftc.gov/system/files/documents/plain-language/bus75-medical-identity-theft-faq-health-care-health-plan.pdf (last visited May 25, 2025).

[49] Melissa D. Berry, *Medicare under attack: Healthcare data breaches increase fraud risks*, THOMSON REUTERS (Mar. 3, 2023), https://www.thomsonreuters.com/en-us/posts/investigation-fraud-and-risk/medicare-fraud-risks.

[50] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO-07-737, U.S. GOV'T ACCOUNTABILITY OFF., at 42 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf (last visited May 25, 2025).

(c) commit immigration fraud; (d) obtain a fraudulent driver's license or ID card in the victim's name; (e) obtain fraudulent government benefits or insurance benefits; (f) file a fraudulent tax return using the victim's information; (g) commit espionage; or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

113. Annual monetary losses for victims of identity theft are in the billions of dollars. In 2017, fraudsters stole $16.8 billion from consumers in the United States, which includes $5.1 billion stolen through bank account take-overs.[51]

114. The annual cost of identity theft is even higher. McAfee and the Center for Strategic and International Studies estimates that the likely annual cost to the global economy from cybercrime is $445 billion a year.[52]

115. For Plaintiffs and Class Members who had their Social Security numbers exposed, the unauthorized disclosure can be particularly damaging because, unlike a credit card, Social Security numbers cannot easily be replaced. Furthermore, as the Social Security Administration warns:

> Keep in mind that a new number probably won't solve all your problems. This is because other governmental agencies (such as the Internal Revenue Service and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other Private Information, credit reporting companies use the number to identify your credit record. So using a new number won't guarantee you a fresh start. This is especially true if your other Private Information, such as your name and address, remains the same.

---

[51] *2018 Identity fraud: Fraud Enters a New Era of Complexity*, JAVELIN, https://www.javelinstrategy.com/coverage-area/2018-identity-fraud-fraud-enters-new-era-complexity (last visited May 25, 2025).

[52] *Facts + Statistics: Identity theft and cybercrime*, INSURANCE INFORMATION INSTITUTE, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last visited May 25, 2025).

> If you receive a new Social Security number, you shouldn't use the old number anymore.

For some victims of identity theft, a new number actually creates new problems. If the old credit card information is not associated with the new number, the absence of any credit history under the new number may make it more difficult to get credit.[53]

116. Reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, in addition to the irreparable damage that may result from the theft of a Social Security number, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. After conducting a study, the Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.

117. Moreover, cybercriminals need not harvest Plaintiffs' and Class Members' Social Security numbers in order to commit identity fraud or misuse their Private Information. Cybercriminals can cross-reference the data stolen from the Data Breach and combine it with other sources to create "Fullz" packages, which can then be used to commit fraudulent activity on Plaintiffs' and Class Members' financial accounts.

118. And, the impact of identity theft can have ripple effects, which can adversely affect the future financial trajectories of victims' lives. For example, the Identity Theft Resource Center reports that respondents to their surveys in 2013-2016 described that the identity theft they experienced affected their ability to get credit cards and obtain loans such as student loans or

[53] *Identity Theft and Your Social Security Number*, SOCIAL SEC. ADMIN., https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited May 25, 2025).

mortgages.[54] For some victims, this could mean the difference between going to college or not, becoming a homeowner or not, or having to take out a high interest payday loan versus a lower-interest loan.

119. It is no wonder then that identity theft exacts a severe emotional toll on its victims.

120. The 2017 Identity Theft Resource Center survey[55] evidences the emotional suffering experienced by victims of identity theft:

- 75% of respondents reported feeling severely distressed;
- 67% reported anxiety;
- 66% reported feelings of fear related to personal financial safety;
- 37% reported fearing for the financial safety of family members;
- 24% reported fear for their physical safety;
- 15.2% reported a relationship ended or was severely and negatively impacted by identity theft; and
- 7% reported feeling suicidal.

121. Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48.3% of respondents reported sleep disturbances;
- 37.1% reported an inability to concentrate / lack of focus;
- 28.7% reported they were unable to go to work because of physical symptoms;

[54] *Identity Theft: The Aftermath 2017*, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter.org/wp-content/uploads/images/page-docs/Aftermath_2017.pdf (last visited May 25, 2025).
[55] *Id.*

- 23.1% reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and
- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[56]

122. There may also be a significant time lag between when Private Information is stolen and when it is actually misused. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[57]

123. As the result of the Data Breach, Plaintiffs and Class Members have suffered and/or will suffer or continue to suffer economic loss, a substantial risk of future identity theft, and other actual harm for which they are entitled to damages, including, but not limited to, the following:

- losing the inherent value of their Private Information;
- losing the value of Defendants' implicit promises of adequate data security;
- identity theft and fraud resulting from the theft of their Private Information;
- costs associated with the detection and prevention of identity theft and unauthorized use of their medical and health insurance information;
- costs associated with purchasing credit monitoring and identity theft protection services;
- unauthorized charges and loss of use of and access to their financial account funds and costs associated with inability to obtain money from their accounts or being

[56] *Id.*
[57] *See Report to Congressional Requesters*, *supra* n.7.

limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

- lowered credit scores resulting from credit inquiries following fraudulent activities;
- costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including discovering fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with the repercussions of the Data Breach; and
- the continued imminent and certainly impending injury flowing from potential fraud and identify theft posed by their Private Information being in the possession of one or many unauthorized third parties.

124. Additionally, Plaintiffs and Class Members place significant value in data security.

125. Because of the value consumers place on data privacy and security, companies with robust data security practices can command higher prices than those who do not. Indeed, if consumers did not value their data security and privacy, companies like Defendants would have no reason to tout their data security efforts to their actual and potential Customers.

126. Consequently, had Customers, including Plaintiffs and Class Members, known the truth about Defendants' data security practices—that the company would not adequately protect and store their data—they would not have entrusted their Private Information with Defendants, elected to receive health benefits that included Defendants' services, or paid for such services or

benefits. As such, Plaintiffs and Class Members did not receive the benefit of their bargain with Defendants because they paid for a value of services they expected but did not receive.

127. When Defendants announced the Data Breach to its Customers, they deliberately underplayed the Data Breach's severity, obfuscated the nature of the Data Breach, and offered only *de minimis* relief. Defendants merely offered Customers twelve months of free identity theft protection service and told them to "check your bills and accounts to be sure they look correct."[58] Not only are these suggestions steps that Plaintiffs and Class Members must take on their own free time, but they fail to compensate Plaintiffs and Class Members for the lifetime risks they face.

128. One year of complimentary identity theft protection services to victims does not adequately address the lifelong harm that Plaintiffs and Class Members will face following the Data Breach. Indeed, the Data Breach involves Private Information that cannot be changed, such as Social Security numbers and PHI.

129. Plaintiffs themselves suffered incidences of harm, including identity theft, which are alleged herein in detail.

## CLASS ACTION ALLEGATIONS

130. Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as appropriate, and (c)(4), Plaintiffs seek certification of the following nationwide class (the "Class"):

> **All persons in the United States and its territories whose Private Information was compromised in the Data Breach reported to have occurred on or about February 26, 2023.**

131. The Class asserts claims against Defendants for negligence (Count I); breach of implied contract (Count II); and for declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.* (Count III).

---

[58] *See* Ex. A; Ex. B.

132. Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns; all federal, state, or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; any judicial officer presiding over any aspect of this matter, members of their immediate family, and members of their judicial staff; any individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; Plaintiffs' counsel and Defendants' counsel; members of the jury; and the legal representatives.

133. Plaintiffs hereby reserve the right to amend or modify the definitions of the Class with greater specificity or division after having had an opportunity to conduct discovery.

134. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical. While the exact number of Class Members is unknown to Plaintiffs at this time, Defendants have acknowledged that the Private Information of at least 8,923,662 individuals throughout the United States and its territories was compromised in the Data Breach. Those persons' names and addresses are available from Defendants' records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include electronic mail, U.S. Mail, internet notice, and/or published notice.

135. **Predominance of Common Issues**. **Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2)'s commonality requirement and Rule 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

a. Whether Defendants unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

b. Whether Defendants' conduct violated the FTC Act and/or HIPAA;

c. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including HIPAA and HITECH;

d. Whether Defendants' data security systems were consistent with industry standards;

e. Whether Defendants knew or should have known that its servers and configurations were vulnerable to attack;

f. Whether Defendants failed to take adequate and reasonable measures to ensure that its computer, applications, and data systems were protected and updated;

g. Whether Defendants failed to take available steps to prevent and stop the Data Breach from happening;

h. Whether Defendants should have discovered the Data Breach earlier;

i. Whether Defendants took reasonable measures to determine the extent of the Data Breach after it was discovered;

j. Whether Defendants owed tort duties to Plaintiffs and Class Members to protect their Private Information;

k. Whether Defendants owed a duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

l. Whether Defendants' delay in informing Plaintiffs and Class Members of the Data Breach was unreasonable;

m. Whether Defendants' method of informing Plaintiffs and Class Members of the Data Breach was unreasonable;

n. Whether Defendants breached their duties to protect the Private Information of Plaintiffs and Class Members by failing to provide adequate data security;

o. Whether Defendants' conduct, including its failure to act, resulted in or was the proximate cause of the Data Breach, resulting in the unauthorized access to and/or theft of Plaintiffs' and Class Members' Private Information;

p. Whether, as a result of Defendants' conduct, Plaintiffs and Class Members face a significant ongoing threat of identity theft, harm, and/or have already suffered harm, and, if so, the appropriate measure of damages to which they are entitled;

q. Whether, as a result of Defendants' conduct, Plaintiffs and Class Members are entitled to injunctive, equitable, declaratory, and/or other relief, and, if so, the nature of such relief.

136. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of other Class Members' claims because Plaintiffs and Class Members were subjected to the same allegedly unlawful conduct and damaged in the same way. Plaintiffs' Private Information was in Defendants' possession at the time of the Data Breach and was compromised as a result of the Data Breach. Plaintiffs' damages and injuries are akin to those of other Class Members and Plaintiffs seek relief consistent with the relief of the Classes.

137. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of the Class because Plaintiffs are each members of the Class and are committed to pursuing this matter against Defendants to obtain relief for the Class. Plaintiffs have no conflicts of interest with the Class. Plaintiffs' Counsel are competent and experienced in

litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the interests of the Class.

138. **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to Plaintiffs and Class Members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and Class Members are relatively small compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

139. **Manageability**. **Fed. R. Civ. P. 23(b)(3).** The litigation of the class claims alleged herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates there would be no significant manageability problems with prosecuting this lawsuit as a class action.

140. **Ascertainability**. All members of the proposed Class are readily ascertainable. The Class is defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the Class. Defendants have access to information

regarding which individuals were affected by the Data Breach and has already provided notifications to some of those people. Using this information, the members of the Class can be identified, and their contact information ascertained for purposes of providing notice to the Class.

141. **Particular Issues. Fed. R. Civ. P. 23(c)(4).** Particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b. Whether Defendants breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether implied contracts existed between Defendants (acting as insurers) on the one hand, and Plaintiffs and Class Members on the other, and the terms of those implied contracts;

e. Whether Defendants breached the implied contracts;

f. Whether Defendants adequately and accurately informed Plaintiffs and Class Members their Private Information had been compromised;

g. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of MCNA's wrongful conduct.

142. **Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2) and (c).** Finally, class certification is also appropriate under Rule 23(b)(2) and (c). MCNA, through its uniform conduct, acted or refused to act on grounds generally applicable to the Classes as a whole, making injunctive and declaratory relief appropriate to the Classes as a whole, including:

a. Ordering Defendants to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

b. Ordering that, to comply with Defendants' explicit or implicit contractual obligations and duties of care, Defendants must implement and maintain reasonable security and monitoring measures, including, but not limited to:

i. prohibiting Defendants from engaging in the wrongful and unlawful acts alleged herein;

ii. requiring Defendants to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendants to delete and purge the Private Information of Plaintiffs and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv. requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiffs' and Class Members' Private Information;

v. requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis;

vi. prohibiting Defendants from maintaining Plaintiffs' and Class Members' Private Information on a cloud-based database until proper safeguards and processes are implemented;

vii. requiring Defendants to segment data by creating firewalls and access controls so that, if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

viii. requiring Defendants to conduct regular database scanning and securing checks;

ix. requiring Defendants to monitor ingress and egress of all network traffic;

x. requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling Private Information, as well as protecting the Private Information of Plaintiffs and Class Members;

xi. requiring Defendants to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xii. requiring Defendants to implement, maintain, review, and revise as necessary a threat management program to appropriately monitor Defendants networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated;

xiii. requiring Defendants to meaningfully educate all Class Members about the threats that it faces because of the loss of its confidential Private Information to third parties, as well as the steps affected individuals must take to protect themselves; and

xiv. Incidental retrospective relief, including but not limited to restitution.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

143. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 142 above, as if fully set forth herein.

144. Plaintiffs bring this claim on behalf of the Class against Defendants.

145. Defendants collected sensitive Private Information from Plaintiffs and Class Members as a requirement for using Defendants' products and services.

146. Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information in its possession from being compromised, lost, stolen, accessed, or misused by unauthorized persons.

147. This duty included, among other things: (a) regularly designing, maintaining, and testing Defendants' security systems to ensure that Plaintiffs' and Class Members' Private

Information in Defendants' possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards, including regularly updating, patching, and evaluating security measures.

148. Defendants' duty to use reasonable care arose from several sources, including but not limited to those alleged herein.

149. Defendants had common law duties to prevent foreseeable harm to Plaintiffs and Class Members. These duties existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices.

150. Defendants' duty to use reasonable security measures also arose as a result of the special relationship that existed between MCNA, on the one hand, and Plaintiffs and Class Members, on the other hand. The special relationship arose because Plaintiffs and Class Members provided their valuable PII and sensitive PHI to Defendants. Only Defendants could have ensured that its security systems and data storage architecture were sufficient to prevent or minimize the Data Breach because it had exclusive knowledge and control regarding same.

151. Defendants had every reason to know that their computing systems and data storage architecture were vulnerable to unauthorized access and targeting by hackers for the purpose of stealing and misusing confidential Private Information. *See supra* ¶ 68 (detailing ransomware targeted to the MCNA patient portal for sale on the dark web since as early as 2019).

152. Defendants also had a duty to promptly notify them of a breach because of state laws and statutes that require Defendants to reasonably safeguard sensitive Private Information, as detailed herein.

153. Timely, adequate notification was required, appropriate, and necessary so that, among other things, Plaintiffs and Class Members could take appropriate measures to freeze or lock their credit profiles; avoid unauthorized charges to their credit or debit card accounts; cancel or change usernames and passwords on compromised accounts; monitor their account information and credit reports for fraudulent activity; contact their banks or other financial institutions that issue their credit or debit cards; obtain credit monitoring services; contact their health insurers or governmental health insurance providers; and take other steps to mitigate or ameliorate the damages caused by Defendants' misconduct. Defendants were the only entities that had sufficient knowledge to properly provide this notice.

154. Defendants breached the duties they owed to Plaintiffs and Class Members alleged above and, thus, were negligent in so to doing. Defendants breached these duties by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols and practices sufficient to protect the Private Information of Plaintiffs and Class Members; (b) detect the Data Breach while it was ongoing; (c) maintain security systems consistent with industry standards during the period of the Data Breach; (d) comply with regulations protecting the Private Information at issue during the period of the Data Breach; and (e) disclose in a timely and adequate manner that Plaintiffs' and Class Members' Private Information in Defendants' possession had been or was reasonably believed to have been, stolen, or compromised.

155. Furthermore, Defendants breached their duty of reasonable care by the following (alone or in combination):

a. Failing to encrypt all sensitive patient Private Information;

b. Failing to implement hardened firewall rules, to blacklist traffic from and to IP addresses known to be malicious;

c. Failing to implement geo-blocking rules to sufficiently restrict access points into Defendants' server environment, so that, if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

d. Failing to enhance password complexity requirements and change administrative-level system accounts' passwords;

e. Failing to install patches to known vulnerabilities in their Citrix cloud software;

f. Failing to respond appropriately to warning, including from the FBI, that ransomware targeting Defendants' patient portal was available for sale on the dark web which they would have received as member of Health-ISAC;

g. Failing to detect and screen for threats in ingress and egress network traffic from international servers despite that Defendants' insureds entirely reside within the United States and would not ordinarily check dental insurance records or make a dental appointment from outside the United States, and despite the international nature of the organizations and threats faced;

h. Failing to include fail-safe features in their systems that, upon detecting unusual levels of international traffic, would have locked down and insulated their systems—and Plaintiffs' and Class Members' Personal Information—from cyber thefts such as the Data Breach;

i. Naming their domains and subdomains in ways that suggested they would likely contain patient Private Information, rather than storing all sensitive patient Private Information in subdomains with innocuous names;

j. Exposing third-party partner services (including Blackbaud, Inc., whose

systems were previously compromised in a well-known data breach disclosed years before Defendants' Data Breach, in 2020) in its subdomains and links that may allow threat actors access by impersonating or compromising attached services and domains;

k. Failing to install sufficient system and security monitoring software across all their servers;

l. Failing to conduct database scanning and securing checks with sufficient frequency;

m. Failing to implement multi-factor authentication across computer systems,, especially where multi-factor authentication is an inexpensive, industry standard, and efficient tool widely available to Defendants to safeguard Plaintiffs' and Class Members' Private Information from cyberthreats, including the Data Breach;

n. Failing to require employees and contractors to change their passwords, and provide account holders with prompts to change their passwords, with sufficient frequency;

o. Failing to require employees to use passwords of sufficient complexity;

p. Failing to provide refresher HIPAA training to its active workforce with sufficient frequency;

q. Failing to issue laptops with sufficiently heightened security standards to all MCNA employees;

r. Failing to implement a threat management program to appropriate monitor Defendants' networks for external threats, and to assess, with sufficient frequency, whether monitoring tools are properly configured, tested, and updated; and

s. Failing to delete and purge the Private Information of Plaintiffs and Class Members no longer needed, such as of former insureds, and/or of medical information (*e.g.*,

medicines, treatment information) past the statute-of-limitations for disputing a claim.[59]

156. But for Defendants' wrongful and negligent breaches of its duties owed to Plaintiffs and Class Members, their Private Information would not have been compromised.

157. Defendants' failure to take proper security measures to protect the sensitive Private Information of Plaintiffs and Class Members created conditions conducive to a foreseeable, intentional act, namely the unauthorized access of Plaintiffs' and Class Members' Private Information.

158. Plaintiffs and Class Members were foreseeable victims of Defendants' inadequate data security practices, and it was also foreseeable that Defendants' failure to provide timely and adequate notice of the Data Breach would result in injury to Plaintiffs and Class Members as alleged in this Complaint.

159. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have been injured and are entitled to compensatory and consequential damages suffered because of the Data Breach in an amount to be proven at trial.

160. Such injuries include one or more of the following: (a) actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (b) the loss of the value of their privacy and the confidentiality of the stolen Private Information; (c) the illegal sale of the compromised Private Information on the black market; (d) the present and continuing threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (e) mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes

[59] The Eleventh Circuit confirmed in 2023 that plaintiffs in data breach cases are not required to "plead with exacting detail every aspect of [a defendant's] security history and procedures that might make a data breach foreseeable." *See Ramirez v. Paradies Shops, LLC*, 69 F.4th 1213, 1220-21 (11th Cir. 2023).

and unfreezes; (f) the time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; (g) the expenses incurred and time spent initiating fraud alerts; (h) the resulting decrease in credit scores and ratings; (i) their lost work time; (j) the lost value of the Private Information; (k) the lost value of access to their Private Information permitted by Defendants; (l) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendants' Data Breach; (m) lost benefit of their bargains and overcharges for services or products; and (n) the nominal and general damages and other economic and non-economic harm suffered.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(Against Defendants in Their Capacities As Insurers)**

161. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 142 above, as if fully set forth herein.

162. Plaintiffs bring this claim on behalf of the Class against Defendants in their capacities as insurers.

163. Defendants, acting in their capacities as insurers, offered to provide services to their Customers, including Plaintiffs and Class Members, in exchange for payment.

164. Defendants also required Plaintiffs and Class Members to provide them with their Private Information in order to receive services.

165. In turn, Defendants impliedly promised to protect Plaintiffs' and Class Members' Private Information through adequate data security measures.

166. Plaintiffs and Class Members accepted Defendants' offer by providing their valuable PII and sensitive PHI to Defendants and their respective providers who in turn provided

that information to Defendants in exchange for Plaintiffs and Class Members receiving Defendants' services.

167. Plaintiffs and Class Members would not have done the foregoing but for the above-described agreement with the companies.

168. A meeting of the minds occurred when Plaintiffs and Class Members agreed to, and did, provide their Private Information to Defendants in exchange for, amongst other things, the protection of such information.

169. Plaintiffs and Class Members fully performed their obligations under the implied contracts with Defendants.

170. However, Defendants breached the implied contracts they made with Plaintiffs and Class Members by failing to safeguard and protect their Private Information and by failing to provide timely and accurate notice to them that their Private Information was compromised as a result of the Data Breach.

171. Defendants further breached the implied contracts with Plaintiffs and Class Members by failing to comply with its promise to abide by HIPAA.

172. Defendants further breached the implied contracts with Plaintiffs and Class Members by failing to ensure the confidentiality and integrity of electronic protected health information Defendants created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1).

173. Defendants further breached the implied contracts with Plaintiffs and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1).

174. Defendants further breached the implied contracts with Plaintiffs and Class

Members by failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. § 164.306(a)(2).

175. In sum, Plaintiffs and Class Members have performed under the relevant agreements, or such performance was waived by the conduct of Defendants.

176. As a direct and proximate result of Defendants' above-alleged breach of implied contract, Plaintiffs and Class Members have suffered (and will continue to suffer): (a) actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (b) the loss of the value of their privacy and the confidentiality of the stolen Private Information; (c) the illegal sale of the compromised Private Information on the black market; (d) the ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (e) the mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; (f) the time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; (g) the expenses incurred and time spent initiating fraud alerts; (h) the resulting decrease in credit scores and ratings; (i) their lost work time; (j) the lost value of the Private Information; (k) the lost value of access to their Private Information permitted by Defendants; (l) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendants' Data Breach; (m) the lost benefit of their bargains and overcharges for services or products; and (n) nominal and general damages; and other economic and non-economic harm.

177. Accordingly, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial, including actual, consequential, and nominal damages, along with costs and attorneys' fees incurred in this action.

**COUNT III**
**DECLARATORY JUDGMENT ACT, 28 U.S.C. §§ 2201 *ET SEQ.***

178. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 142 above, as if fully set forth herein.

179. Plaintiffs bring this claim on behalf of the Class against Defendants.

180. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state statutes described in this Complaint.

181. Defendants owed a duty of care to Plaintiffs and Class Members, which required them to adequately monitor and safeguard Plaintiffs' and Class Members' Private Information.

182. Defendants still possess the Private Information belonging to Plaintiffs and Class Members.

183. Plaintiffs allege that Defendants' data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Private Information and the risk remains that further compromises of their Private Information will occur in the future.

184. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owe a legal duty to secure Plaintiffs' and Class Members' Private Information under the common law, HIPAA, the FTCA, and other state and federal laws and regulations, as set forth herein;

b. Defendants' existing data monitoring measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security

procedures and practices that are appropriate to protect individuals' Private Information; and

c. Defendants continue to breach this legal duty by failing to employ reasonable measures to secure Plaintiffs' and Class Members' Private Information.

185. This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with legal and industry standards to protect members' Private Information, including the following:

a. Order Defendants to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

b. Order that, to comply with Defendants' explicit or implicit contractual obligations and duties of care, Defendants must implement and maintain reasonable security and monitoring measures, including, but not limited to:

i. prohibiting Defendants from engaging in the wrongful and unlawful acts alleged herein;

ii. requiring Defendants to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendants to delete and purge the Private Information of Plaintiffs and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv. requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity

of Plaintiffs' and Class Members' Private Information;

v. requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis;

vi. prohibiting Defendants from maintaining Plaintiffs' and Class Members' Private Information on a cloud-based database until proper safeguards and processes are implemented;

vii. requiring Defendants to segment data by creating firewalls and access controls so that, if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

viii. requiring Defendants to conduct regular database scanning and securing checks;

ix. requiring Defendants to monitor ingress and egress of all network traffic;

x. requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling Private Information, as well as protecting the Private Information of Plaintiffs and Class Members;

xi. requiring Defendants to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting

personal identifying information;

xii. requiring Defendants to implement, maintain, review, and revise as necessary a threat management program to appropriately monitor Defendants' networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated; and

xiii. requiring Defendants to meaningfully educate all Class Members about the threats that it faces because of the loss of its confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves.

186. If an injunction is not issued, Plaintiffs will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach of Defendants' systems. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

187. The hardship to Plaintiffs if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. The cost of Defendants' compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal duty to employ such measures.

188. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach of Defendants' systems and network, thus preventing future injury to Plaintiffs and other members whose Private Information would be further compromised.

189. Following the issuance of the declaratory relief requested herein, pursuant to 28

U.S.C. § 2202, Plaintiffs and the Class will seek any further necessary or proper relief, including damages, after reasonable notice and hearing, against Defendants.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiffs, individually and on behalf of all others similarly situated, request the following relief:

A. An order certifying this action as a class action and appointing Plaintiffs as Class representatives and the undersigned as Class Counsel;

B. A declaration that Defendants breached their duties to Plaintiffs and Class Members;

C. A mandatory injunction directing Defendants to adequately safeguard the Private Information of Plaintiffs and the Class hereinafter by implementing improved security procedures and measures;

D. A mandatory injunction requiring that Defendants provide notice to each Class Member relating to the full nature and extent of the Data Breach and the disclosure of Private Information to unauthorized persons;

E. An order enjoining Defendants from further unfair, deceptive, and unconscionable practices and making untrue statements about the Data Breach and the stolen Private Information;

F. An award of damages, including actual, nominal, consequential damages, statutory, and/or punitive, as allowed by law in an amount to be determined;

G. An award of pre- and post-judgment interest, costs, attorneys' fees, expenses, and interest as permitted by law;

H. For all other orders, findings, and determinations identified and sought in this Complaint; and

I. Such other and further relief as this court may deem just and proper.

## I. JURY TRIAL DEMANDED

Under Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury for all issues so triable as of right.

Dated: May 26, 2025.

Respectfully Submitted,

By: *Jeff Ostrow*

Jeff Ostrow FBN 121452
**KOPELOWITZ OSTROW FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 332-4200
ostrow@kolawyers.com

Peter Prieto FBN 501492
**PODHURST ORSECK, P.A.**
One S.E. 3rd Avenue, Suite 2300
Miami, Florida 33131
Telephone: (305) 358-2800
pprieto@podhurst.com

Stephanie A. Casey FBN 97483
**COLSON HICKS EIDSON, P.A.**
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Telephone: (305) 476-7400
scasey@colson.com

*Counsel for Plaintiffs and the Putative Class*